UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WILLIAM HOWARD, *et al.*, on behalf of
themselves and others similarly situated,

      Plaintiffs,

v.

UBP BAY CITY, LLC, d/b/a BAY CITY BRIDGE
PARTNERS, and CITY OF BAY CITY,

      Defendants.
_____/

Case No. 1:25-cv-10926

Honorable Thomas L. Ludington
United States District Judge

**OPINION AND ORDER OF RECUSAL**

      Currently before the Court is a putative class action against the City of Bay City and UBP Bay City—a private company the City contracted with to rehabilitate and maintain the Independence Bridge, one of the four bridges crossing the Saginaw River within the City. The named Plaintiffs and putative class—all nonresidents of Bay City—contend that they are third-party beneficiaries of the contract between the City and UBP. And Plaintiffs primarily allege both Defendants breached their contracts by prematurely tolling drivers who crossed the Bridge, and by offering an unlimited monthly subscription—in lieu of individual tolls—when access to the Bridge was limited.

      Although important motions are pending in this case, I cannot decide them. Indeed, I—like the putative class members—do not reside in Bay City. Accordingly, even though I am excluded from the putative class, I must pay a toll to UBP every time I cross the Independence Bridge and its twin, the Liberty Bridge. And I cross these bridges frequently. Indeed, I rely on them at least ten times per week as I commute to the Northern Division's courthouse located in Bay City. So, to minimize my costs, I purchased the very unlimited pass at issue in this litigation. As a result, I

have paid UBP subscription fees each month for nearly one year. As explained in greater detail below, I must recuse.

## I.

Michiganders have a special way of telling you where they're from. Traditionally, they hold up their hand, make a "mitten"—representing Michigan's lower peninsula—and point. Bay City, Michigan falls where the thumb meets the rest of the hand. As its name suggests, Bay City sits just below the Saginaw Bay. It's a beautiful place. But to get to most of Bay City by car, you have to cross the Saginaw River on a bridge. And you generally have four choices: Independence Bridge ("Independence"), Liberty Bridge ("Liberty"), Veterans Memorial Bridge ("Vet's"), and Lafayette Avenue Bridge ("Lafayette").[1] This case primarily concerns Independence, and presents a putative breach-of-contract class action against both the City and the private company it contracted with to rehabilitate and maintain the bridge, ensure public access, and assess reasonable tolls.

### A. The Bridges

Bay City's bridges are uniquely organized. The Michigan Department of Transportation (MDOT) owns, operates, and maintains Vet's and Lafayette, the two southern bridges. *See Bridge Division*, BAY CITY GOV'T, https://www.baycitymi.gov/178/Bridge-Division [https://perma.cc/J5VW-BWGH] (last visited June 23, 2025). The City itself owns the two northern bridges, Independence and Liberty. *Id.* But the City leased Independence and Liberty to United Bridge Partners (UBP)—a private Colorado company "created in 2010 to address the

---

[1] Lafayette is closed for construction until 2027. *See* Joey Oliver, *Hello, Bay City: Welcome to a Town Where Independence and Liberty Aren't Free*, MLIVE (June 27, 2025, at 10:00 AM), https://www.mlive.com/news/saginaw-bay-city/2025/06/hello-bay-city-welcome-to-a-town-where-independence-and-liberty-arent-free.html [https://perma.cc/U2JE-KR5E].

country's infrastructure crisis with private financing solutions." *About Us,* BAY CITY BRIDGE PARTNERS, https://baycitybridgepartners.com/about/ [https://perma.cc/PCD5-R96Z] (last visited June 23, 2025). Here's a helpful graphic:



Money motivated the decision to privatize the Independence and Liberty bridges. Indeed, in late 2016, the City discovered these bridges needed expensive repairs to comply with MDOT standards, and later determined that it could not afford those repairs. *See* Joey Oliver, *The $5M Deal That Changed Bay City's Bridges and the 9 People Who Voted For It*, MLIVE (Mar. 12, 2025, at 1:20 PM), https://www.mlive.com/news/saginaw-bay-city/2025/03/the-5m-deal-that-changed-bay-citys-bridges-and-the-9-people-who-voted-for-it.html [https://perma.cc/8 ANJ-KF8A] (noting the City leased the bridges to UBP because it was "facing a financial crisis" and required more than "$7 million in maintenance and repairs to keep [the] bridges compliant with [MDOT]

inspections"); *Bay City Bridges: How Did We Get to This Point?*, BAY AREA CHAMBER OF COM. (Feb. 2023), https://www.baycityarea.com/bay-city-bridges/how-we-got-here [https://perma.cc/JEY2-VG2K] (noting that a 2016 inspection revealed the City "needed to make $6 million in critical repairs to Liberty and Independence bridges" and that Bay City did not have a sufficiently sizeable population to pay for these repairs with tax proceeds); *accord* ECF No. 1-1 at PageID.22. So, UBP created a local subsidiary—United Bay City, LLC, d/b/a Bay City Bridge Partners (BCBP)—to enter into Concession and Lease Agreements with the City in March 2023. *See* ECF No. 1-1 at PageID.42–214.

### B. The Agreements

Under these Agreements' terms, BCBP agreed to "design, upgrade, modernize, fully rehabilitate, operate, and maintain" Independence and Liberty.[2] *Id.* at PageID.50. After rehabilitation, aside from occasional construction closures, BCBP was responsible for ensuring that the bridges were "available for use by the general public" "at all times." *Id*. at PageID.50.

But the Agreements did not require BCBP to pay maintenance costs with funds from its own pockets. Instead, the Agreements authorized BCBP to toll drivers who crossed the bridges. *Id.* at PageID.53 (noting the tolls would "compensate the private investors and provide for all ongoing operations and maintenance").

As contemplated in the Agreements, the "tolling structure" is complicated. BCBP was "solely responsible" for "setting the [specific] amount" to be collected. *Id.* But BCBP agreed to specific initial toll rates, as well as a future adjustment structure. *Id.* at PageID.149–51. Critically, BCBP could not begin tolling until *after* the bridges were rehabilitated or, to use the Agreements'

---

[2] Notably, the Agreements also indemnified the City and provided BCBP was solely liable for "the design, planning, permitting, construction, operation, repair, maintenance, and rehabilitation" of the Bridges. ECF No. 1-1 at PageID.59.

language, "complete." *See id.* at PageID.149, 52. And the Agreements set a high bar for completion: a bridge was only "complete" once rehabilitated such that it could be "continuously open and operational for use by the public for highway purposes, 24 hours a day, in the ordinary course for thirty consecutive[] days." *Id.* at PageID.52.

According to the Agreements, once the bridges were "complete," BCBP could begin tolling any driver who did not live in Bay City ("nonresidents"). *Id.* at PageID.149–50. But the Agreements expressly prohibited BCBP from tolling Bay City residents for five years after competition, so long as the resident created an online account and affixed a BCBP-provided transponder to their car as they crossed either bridge. *Id.* at PageID.149.

### C. The Construction and Confusion

After signing the Agreements, BCBP went to work. The Liberty Bridge rehabilitation project began in November 2021 and the Independence Bridge rehabilitation project began in late 2022. *See* Joey Oliver, *A Tale of Two Bridges: A Timeline of Bay City's Toll Controversy*, MLIVE (Feb. 27, 2025, at 9:00 AM), https://www.mlive.com/news/saginaw-bay-city/2025/02/a-tale-of-two-bridges-a-timeline-of-bay-citys-toll-controversy.html [https://perma.cc/QV4R-386Z]. As construction commenced, BCBP and the City aggressively advertised the "BC Pass" to both residents and nonresidents. *See* ECF No. 1-1 at PageID.213. The Pass was—and is—required for residents who wish to cross Independence and Liberty toll-free. *See Tolling*, BAY CITY BRIDGE PARTNERS, https://baycitybridgepartners.com/tolling/ [https://perma.cc/FM4Q-PQX7] (last visited June 6, 2025). And BCBP and the City advertised the Pass for nonresidents who wished to pay a flat, monthly fee for unlimited crossings. *See id*; ECF No. 1-1 at PageID.27.

BCBP began tolling at the Liberty Bridge on June 16, 2023, and began tolling at the Independence Bridge on January 1, 2025. *FAQs: When Will Tolling Begin?*, BAY CITY BRIDGE

PARTNERS, https://baycitybridgepartners.com/tolling/faqs/ [https://perma.cc/639L-NF5Z] (last visited June 26, 2025).

Then came confusion and construction. Although BCBP charged tolls as if the Independence Bridge was "complete" and open for continuous, 24-hour use, it proceeded to close the bridge on numerous occasions. As alleged, BCBP closed Independence Bridge on the following dates and times:

1. On January 15, 2025, from 7:00 PM to 7:00 AM;
2. On January 16, 2025, from 7:00 PM to 7:00 AM;
3. From 12:13 PM on January 27, 2025 to 5:00 PM on January 31, 2025;
4. On February 3, 2025, from 7:00 PM to 7:00 AM;
5. On February 4, 2025, from 7:00 PM to 7:00 AM;
6. On February 5, 2025, from 7:00 PM to some unknown time;
7. On February 6, 2025, from 7:00 PM to 7:00 AM;
8. On February 11, 2025, from 7:00 PM to 7:00 AM;
9. On February 12, 2025, from 7:00 PM to 7:00 AM;
10. On February 13, 2025, from 7:00 PM to 7:00 AM;
11. On February 14, 2025, from 7:00 PM to 7:00 AM;
12. On February 17, 2025, from 7:00 PM to 7:00 AM;
13. On February 18, 2025, from 7:00 PM to 7:00 AM;
14. On February 19, 2025, from 7:00 PM to 7:00 AM;
15. On February 20, 2025, from 7:00 PM to 7:00 AM;
16. On February 24, 2025, from 7:00 PM to 7:00 AM;
17. On February 25, 2025, from 7:00 PM to 7:00 AM;
18. On February 26, 2025, from 7:00 PM to 7:00 AM;
19. On February 27, 2025, from 7:00 PM to 7:00 AM;
20. On March 3, 2025, from 7:00 PM to 7:00 AM;
21. On March 4, 2025, from 7:00 PM to 7:00 AM;
22. On March 5, 2025, from 7:00 PM to 7:00 AM;
23. On March 6, 2025, from 7:00 PM to 7:00 AM; and
24. On March 7, 2025, from 7:00 PM to 7:00 AM.

*See* ECF No. 1-1 at PageID.24–27. All the while, BCBP collected tolls and charged nonresidents monthly fees for unlimited subscriptions. *See id.*

And the tolls BCBP charged were similarly sporadic. Initially, BCBP charged nonresidents $15 per month for an unlimited pass. *Id.* at PageID.27. But, on February 3, 2025, BCBP doubled this rate with little explanation. *See id.* at PageID.29. BCBP additionally announced that it would

"no longer offer the monthly unlimited option to those who have not already signed up," such that the doubled price would "only appl[y] to existing subscription customers." *Id.* Moreover, BCBP announced all unlimited plans would terminate "in July" 2025 and, at that point, BCBP "may consider alternative promotions." *Id.*

### D. The Case

On March 4, 2025, eight named Plaintiffs—William Howard, Jason Duemler, Nicole Duemler, Ann Duemler, Michael Lutz, Sherri Howell, Rochelle Jammer, and Mark Kohlhorst—filed a putative class action against UBP (doing business as BCBP) and the City in Bay County Circuit Court. *See generally* ECF No. 1-1. The scope of the putative class is importantly narrow. As defined, the putative class consists of "all *non-Bay City residents* and drivers who have crossed the Independence Bridge and paid any toll *or* purchased an unlimited pass from BCBP[.]" *Id.* at PageID.30. The proposed class explicitly excludes Counsel, the presiding judge, and court staff. *Id.*

The named Plaintiffs contend that, as nonresidents, they and the putative class members are "third-party beneficiaries"[3] of the Lease Agreements between the City and BCBP. *Id.* at PageID.33. Accordingly, Plaintiffs allege BCBP and the City breached the Agreements by charging tolls and collecting unlimited subscription payments before Independence Bridge was "complete" as that prerequisite is defined. *Id.* at PageID.32–33 (Count II). Plaintiffs also allege that additional

---

[3] Third-party beneficiaries must be intentional, not merely incidental. *Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 608 (E.D. Mich. 2017); *accord Montgomery v. Kraft Foods Glob., Inc.*, No. 1:12-CV-00149, 2012 WL 6084167, at *13 (W.D. Mich. Dec. 6, 2012), *aff'd*, 822 F.3d 304 (6th Cir. 2016). "To sue as a third party beneficiary, the third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party." *Ahmad v. Wells Fargo Bank, NA*, 861 F. Supp. 2d 818, 828 (E.D. Mich. 2012); *see also Tinney v. City of Detroit*, 188 F.3d 509 (6th Cir. 1999) (table) (noting third-party beneficiary status depends on whether, objectively, the contract was primarily intended for something other than the benefit of the contracting parties).

"express contract[s]" were formed when they purchased unlimited passes as a result of BCBP's advertisements, and that BCBP breached these contracts primarily by limiting access to Independence Bridge once it was purportedly "complete." *Id.* at PageID.35 (Count III). In the alternative, if no "express contracts" were formed, Plaintiffs allege BCBP breached implied contracts for the same reasons. *Id.* at PageID.35–36 (Count IV). Plaintiffs further allege BCBP has been unjustly enriched through their tolls and subscription fees. *Id.* at PageID.37–38 (Count V). And Plaintiffs assert Defendants violated the Michigan Consumer Protection Act, *id.* at PageID.38–39 (Count VI), and "public trust principles," *id.* at PageID.31–32 (Count I). Plaintiffs' class complaint is summarized below:

| Count | Claim | Defendant(s) |
| --- | --- | --- |
| I | Violation of Public Trust Principles | BCBP & City of Bay City |
| II | Third-Party Beneficiary Breach of Contract (Lease Agreements) | BCBP & City of Bay City |
| III | Breach of Contract (Unlimited Pass Purchases) | BCBP |
| IV | Breach of Implied Contract (Unlimited Pass Purchases) | BCBP |
| V | Unjust Enrichment | BCBP |
| VI | Violation of the Michigan Consumer Protection Act | BCBP |
| VII | Injunctive Relief[4] | BCBP & City of Bay City |

*See* ECF No. 1-1.

On April 1, 2025, Defendants removed the case to federal court, invoking jurisdiction under the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. §§ 1332(d), 1453(b). ECF No. 1. The next day, Plaintiffs filed a motion seeking early discovery to ensure federal CAFA jurisdiction is proper. ECF No. 12. One month later, Defendants filed separate motions to dismiss. ECF Nos. 20; 21. And Plaintiff responded with an "emergency" motion to hold those motions to dismiss in

---

[4] Injunctive relief is a form of equitable remedy, not a distinct cause of action. *HPIL Holding, Inc. v. Zhang*, 734 F. Supp. 3d 664, 689 (E.D. Mich. 2024) (collecting cases).

"abeyance" pending the resolution of the federal jurisdictional question. ECF No. 22. But conflicts of interest preclude the undersigned from crossing these bridges. I must recuse.

## II.

Federal judges must disqualify themselves from presiding in "any proceeding" in which his or her impartiality "might reasonably be questioned." 28 U.S.C. § 455(a). This subsection was intended to "avoid even the appearance of partiality." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988). So, "[i]f it would appear to a reasonable person that a judge has knowledge of facts that would give him [or her] an interest in the litigation[,] then an appearance of partiality is created even [if] no actual partiality exists." *Id.*

Separately, judges must also recuse when they have a "financial interest in the subject matter in controversy or in a party to the proceeding." *Id.* § 455(b)(4). This interest need not be substantial. Indeed, prohibited financial interests include (1) a "legal or equitable interest, *however small* . . . in the affairs of a party," or (2) "active participa[tion]" in such affairs. *Id.* § 455(d)(4) (emphasis added).

My impartiality might reasonably be questioned in this case. Additionally, I have a financial interest in BCBP—albeit a small one. I do not live in Bay City, but I commute to and from the city each day during the work week to preside from the Northern Division courthouse located there. In other words, during a normal work week, I cross the bridges at least ten times. And I frequently cross the bridges leased and tolled by BCBP—Independence and Liberty—especially since the Lafayette Bridge is closed for construction until 2027. *See supra* n.1. As a nonresident, I must pay tolls each time I do so. Accordingly, to minimize my costs, I purchased an unlimited pass from BCBP beginning in the summer of 2024. I have made monthly payments to BCBP ever since. *See also* ECF No. 1-1 at PageID.29 (recommending the unlimited pass for nonresidents who cross the

Liberty and Independence Bridges at least 15 times per month). And I have owned this unlimited pass throughout the entire period Plaintiffs allege BCBP (1) deprived nonresidents like me the benefit of our bargain by closing the Independence Bridge and limiting the "unlimited" nature of the subscription, and (2) collected tolls and subscription fees when doing so was premature under BCBP's Lease Agreements with the City.

I cannot avoid recusal under the exception articulated in § 455(f). That subsection allows judges to retain a case despite a financial interest if "substantial judicial time has been devoted to the matter" and the judge "divests himself or herself of the interest." 28 U.S.C. § 455(f); *see also In re Aetna Cas. & Sur. Co.*, 919 F.2d 1136, 1147 (6th Cir. 1990) (Kennedy, J., concurring) (noting this is the "only statutory provision permitting a trial judge to cure a disqualification"). But "substantial judicial time" has *not* been devoted to this case. The case has been pending in federal court for less than three months, and no opinions or orders have been entered. *See Canale v. Colgate-Palmolive Co.,* No. 16-CV-3308 (CS), 2017 WL 112610, at *2 (S.D.N.Y. Jan. 10, 2017) (finding § 455(f) inapplicable because the presiding judge only issued a "one-sentence order" and, thus, did not invest substantial judicial time into the matter); *c.f. Perpich v. Cleveland Cliffs Iron Co.*, 927 F. Supp. 226, 231 (E.D. Mich. 1996) (applying § 455(f) because, before the recusal issue arose, the case had been pending for two years, and "other judicial officers of the Eastern District . . . expended a substantial amount of time on th[e] case," which was at the summary judgment stage).

I also cannot avoid recusal simply because Plaintiffs' proposed class definition expressly excludes me. *See* ECF No. 1-1. True, a judge's inclusion in a putative class *creates an additional*

- 10 -

financial interest warranting recusal under § 455(b)(4).[5] *See Tramonte v. Chrysler Corp.*, 136 F.3d 1025, 1030 (5th Cir. 1998). But exclusion from a putative class does not *diminish an existing* financial interest, like my historic participation in BCBP's financial affairs. And exclusion from the putative class definition does not make the public's perception of partiality in this case any less reasonable under §455(a). Although I am confident that I could impartially preside over these proceedings, my confidence is irrelevant to § 455(a). *See Garrett v. Ohio State Univ.*, 60 F.4th 359, 369 (6th Cir.). Even if I am excluded from the putative class definition, my dealings with Defendant BCBP could—from the public's perspective—reasonably result in partial decisions concerning pending issues—like whether federal CAFA jurisdiction exists, and whether the case should be dismissed—or future issues like class certification. Indeed, Plaintiffs expressly seek an injunction prohibiting BCBP from tolling on the Independence Bridge until the bridge is fully "complete." ECF No. 1-1 at PageID.32. So, even if I am excluded from the putative class—and, thus, could not receive any contractual or quasi-contractual damages—I would still benefit from Plaintiffs' success on the merits. For these reasons, my recusal is required.

I do not make this decision lightly. I recognize that "it is far more difficult for judges in smaller or rural locales to . . . disqualify themselves . . . without . . . delaying litigants." *See Heron Cove Ass'n v. Midland Cnty. Bd. of Commissioners*, Case No. 1:24-11458 (E.D. Mich. July 17, 2024). And I recognize recusal in this case is a close call. But "[w]here the question is close, the

---

[5] And a judge can theoretically avoid recusal by promptly divesting and renouncing this additional interest. *See, e.g.*, *Corr v. Metro. Wash. Airports Auth.*, 481 F. App'x. 616, 616–17 (Fed. Cir. 2012) (noting "the appropriate course is to renounce any financial interest that could arise from class membership"); *Litwin v. Am. Express Co.*, 838 F. Supp. 855, 857 n.1 (S.D.N.Y. 1993) (noting that the presiding judge and his family, as potential members of an uncertified class, opted out of a class action and waived any right to recovery); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 311 n.15 (N.D. Ga. 1993) ("The Court and all of its relatives . . . necessarily elected to exclude themselves from the settlement class.").

judge must recuse[.]" *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993). At bottom, I am the only federal district judge in the Northern Division. And the Northern Division courthouse—quite literally—sits at one end of the bridges whose tolls and closures underlie all claims in the above-captioned case. As I have crossed these bridges and paid these tolls—and will continue to do so——I cannot preside over this case.

### III.

Accordingly, it is **ORDERED** that, pursuant to 28 U.S.C. § 455, I hereby **DISQUALIFY** myself from the above-captioned case.

Further, it is **ORDERED** that the Clerk of Court is **DIRECTED** to **REASSIGN BY BLIND DRAW** the above-captioned case to another judge of this honorable Court.

**This is not a final order and does not close the above-captioned case.**

Dated: July 8, 2025                              s/Thomas L. Ludington
                                                 THOMAS L. LUDINGTON
                                                 United States District Judge