UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM HOWARD, et al.,

       Plaintiffs,

v.

                                          Case No. 25-cv-10926
                                          HON. MARK A. GOLDSMITH

UBP BAY CITY, LLC, et al.,

       Defendants.

_____/

### ORDER (1) GRANTING IN PART UBP BAY CITY'S MOTION TO DISMISS (Dkt. 20) AND (2) GRANTING BAY CITY'S MOTION TO DISMISS (Dkt. 21)

This case concerns the Independence Bridge in Bay City.  Plaintiffs are motorists who have paid tolls and/or purchased a monthly pass to cross the bridge.  They brought this class action against Defendants Bay City, which owns the bridge, and the UBP Bay City, LLC (UBP), which restored it under an agreement with the City and now operates it.  Under that agreement, UBP promised it would not charge for tolls until the bridge restoration was substantially completed.  Plaintiffs assert breach of contract and related state-law claims based principally on (i) UBP's decision to start charging tolls before restoration was allegedly substantially completed, and (ii) UBP's allegedly excessive bridge closures after re-opening.  Both Defendants filed motions to dismiss the respective counts against them (Dkts. 20, 21).  For the reasons below, the Court grants in part UBP's motion to dismiss—dismissing Counts I, II, VI, and VII but not Counts III, IV, and V.  The Court grants the City's motion to dismiss both counts against it (Counts I, II).[1]

---

[1] Because oral argument will not aid the Court's decisional process, the motions will be decided based on the parties' briefing.  See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  In addition to the pending motions, briefing includes: (i) as to UBP's motion to dismiss: Plaintiffs' response

## I.   BACKGROUND

Built in 1976, the bridge had since fallen into disrepair, prompting the City to search for a solution to address bridge repair and maintenance costs.  Compl. ¶¶ 18–19, 24–27 (Dkt. 1); see Agreement (Dkt. 1-1).  In 2023, UBP and the City entered into a Concession and Lease Agreement.  Notice of Removal ¶ 6.  The parties agreed that upon substantially completing the bridge rehabilitation, UBP would receive the right to collect tolls from vehicles using the bridge for a period of 75 years.  Compl. ¶ 29.  UBP began tolling on the bridge in January 2025.  Id. ¶¶ 7–13.

Plaintiffs are a group of motorists who paid a toll or purchased a monthly pass and crossed the bridge between January 1, 2025 and March 1, 2025.  In this action, they allege that it was unlawful for UBP to begin tolling in January 2025 because the bridge was not substantially completed and plaintiffs were deprived of their rights to 24/7 access to the bridge due to periodic bridge shutdowns following the re-opening of the bridge.  Id. ¶¶ 106–165.

Plaintiffs assert seven causes of action; Counts I and II are against both Defendants, with the remaining counts against UBP only.  See Compl.  Plaintiffs allege: violation of the public trust doctrine (Count I), third-party beneficiary breach of contract (Counts II and III), breach of implied contract (Count IV), unjust enrichment (Count V), violation of Michigan Consumer Protection Act (Count VI), and request for injunctive relief (Count VII).  Id.

## II.   ANALYSIS[2]

---

(Dkt. 35) and UBP's reply (Dkt. 37); (ii) as to Bay City's motion to dismiss: Plaintiffs' response (Dkt. 34) and Bay City's reply (Dkt. 36).

[2] To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  The plausibility standard requires courts to accept the alleged facts as true and to make all reasonable inferences in favor of the plaintiff.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In its motion, UBP argues that all seven counts against it should be dismissed.  In the City's motion to dismiss, it argues that both Plaintiffs' claims against it should be dismissed.  Because Plaintiffs allege Counts I and II are against both Defendants, the discussion below regarding the issues raised in those counts—the public trust doctrine and third-party beneficiary—applies to both Defendants.

### A. UBP's Motion to Dismiss

In its motion, UBP argues that the counts against it should be dismissed because: (i) Plaintiffs cannot state a private right of action under the public trust doctrine; (ii) Plaintiffs cannot bring their breach of contract claims because they are not third-party beneficiaries; (iii) Plaintiffs have failed to plead an unjust enrichment and Michigan Consumer Act claim; and (iv) Plaintiffs injunctive relief claim is not an independent cause of action.  UBP Mot. at PageID.367–382.  The Court will consider each of these arguments in turn.

### 1. Public Trust Doctrine

In Count I of their complaint, Plaintiffs allege that UBP (and the City, as well) violated the public trust doctrine by impeding access to the bridges and roads that cross the Saginaw River by virtue of "unreasonable tolling and its disproportionate impact . . . on a select group of individuals and businesses."  Compl. ¶¶ 109–110.

The public trust doctrine "is a legal principle as old as the common law itself," which imposes on the sovereign the duty to protect the public's access to navigable waterways. Glass v. Goeckel, 703 N.W.2d 58, 61 (Mich. 2005).  Michigan courts have interpreted the doctrine to impose a duty on the state to protect the rights of the public to access "the Great Lakes for fishing, hunting, and boating for commerce or pleasure." Id. at 65.

3

UBP asserts that Plaintiffs' invocation of the doctrine is invalid, because the doctrine protects the public's interest in waterways— not all public resources.  UBP Mot. at 7–8 (citing Glass, 703 N.W.2d at 62–65).  Plaintiffs argue for a broad reading of the doctrine, such that it would encompass an expansive range of public resources, which they describe as "public infrastructure, including roads and bridges crossing large bodies of water."  Compl. ¶108; see Pls. Resp. at 8–9.  And they seek to use this broad reading to assert a claim based on unreasonable tolling.  Compl. ¶109.  Plaintiffs, however, offer no authority for such a reading.  The cases they cite show that the doctrine has been invoked in disputes regarding ownership or right to use lands under or adjacent to waterways.  Such cases have no resemblance to a dispute about "unreasonable tolling."

In Glass, for example, the dispute was whether the littoral landowners could block an individual who wanted to walk along the Lake Huron shoreline that abutted the landowners' property.  703 N.W.2d at 61.  The pedestrian's invocation of the public trust doctrine was upheld by the Michigan Supreme Court, which reasoned that when the state originally conveyed the littoral property, that property remained subject to a specific public trust right in Lake Huron and its shores up to the ordinary high-water mark.  Id. at 62.

All the rest of the cases Plaintiffs cites are not in any way analogous to Plaintiffs' claims. See Vill. of Kalkaska v. Shell Oil Co., 446 N.W.2d 91, 91 (Mich. 1989) (concerning "whether the Village or County of Kalkaska obtained a proprietary interest in oil and gas lying beneath the surface of land that was designated . . . for public use as streets or alleys"); Obrecht v. Nat'l Gypsum Co., 105 N.W.2d 143, 146 (Mich. 1960) (addressing whether a private company that owned Lake Huron frontage could build a large permanent dock extending into the lake without state permission); Thompson v. Enz, 154 N.W.2d 473, 477 (Mich. 1967) (while not mentioning

the public trust doctrine, holding that impact on the public's use of a public inland lake where a riparian owner sought to alter the natural shore line by digging a canal over objection of other riparian owners);  Bott v. Comm'n of Nat. Res. of State of Mich. Dep't. of Nat. Res., 327 N.W.2d 838 (Mich. 1982) (concerning whether the public trust doctrine impacted private property owner's claim to ownership of a lake and creek).  These cases have no connection to a claim that tolling arrangements are not "reasonable."

The claim in the instant case has nothing to do with property rights in or under the state's waterways.  And Plaintiffs do not assert a property right in the bridge.  Their claim is purely a monetary one—that they are entitled to a free ride across it until substantial completion.  There is no public trust dimension to such a claim.

Because Plaintiffs have not pled a viable public trust claim, Count I must be dismissed.

### 2. Third-Party Beneficiaries

In Count II, Plaintiffs assert a claim against UBP (and the City) for breach of the agreement with the City, claiming to be third-party beneficiaries.  See Compl. ¶ 114.

Mich. Comp. Laws § 600.1405 governs the right of a third-party beneficiary to enforce contracts:

> Any person for whose benefit a promise is made by way of contract . . . has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.

It further says:

> A promise shall be construed to have been made for the benefit of a person whenever the promisor had undertaken to give or to do or refrain from doing something directly to or for said person.

Mich. Comp. Laws § 1405(1).  Under Michigan law, "only intended, not incidental, third-party beneficiaries may sue for breach of a contractual promise in their favor."  Schmalfeldt v. N. Pointe Ins. 4 Co., 670 N.W.2d 651, 654 (Mich. 2003).  "A third-party beneficiary

may be one of a class of persons, if the class is sufficiently described or designated" in the

agreement.   Koenig v. City. of S. Haven, 597 N.W.2d 99, 105–106 (Mich. 1999)

(punctuation modified).

UBP asserts that, Plaintiffs cannot be deemed third-party beneficiaries, because there is no

specific language in the agreement referring to Plaintiffs as beneficiaries.  Plaintiffs respond that

that they are "sufficiently described" beneficiaries.  Resp. to UBP Mot. at PageID.654.  They point

to identifiers in the agreement, such as "bridge users" or "toll-paying motorists,"[3] which they claim

indicate that the beneficiary of the agreement is not the "City qua City" but "bridge users" (i.e.

Plaintiffs).  Id. at PageID.654–655.

Although the parties' arguments frame much of their dispute as "whether a class is

reasonably identified" under Koenig, the threshold inquiry is whether the parties to the agreement

intended to benefit non-parties in more than an incidental way.  No matter how well defined a class

may be, if the agreement was not created with the intent to make an individual or a class the direct

beneficiary of a promise, such a person or class cannot enforce the agreement.

In terms of intent, the particular nature of the contract— one negotiated and entered into

by a government entity— is important.  Government contracts are generally not assumed to create

third-party beneficiaries, because the public is almost always in some sense the beneficiary of such

contracts:

> Government contracts by their nature benefit the public, but only in rare
> circumstances will courts deem individual members of the public to be intended
> beneficiaries empowered to enforce those contracts in court.  See Restatement
> (Second) of Contracts § 313(2) cmt. a (1981) ("Government contracts often benefit
> the public, but individual members of the public are treated as incidental
> beneficiaries unless a different intention is manifested.").  This principle recognizes

---

[3] The phrase "toll-paying motorists" does not appear in the agreement, but the phrase "Bay City Motorists" does appear.  Agreement at 1 ("stating that the purpose of the agreement is for UBP to operate and maintain the bridge "for the benefit of Bay City motorists").

> the complications that would ensue from private enforcement of government contracts by members of the general public. See, e.g., German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 33 S.Ct. 32, 57 L.Ed. 195 (1912). To overcome the "basic contract principle that third party beneficiaries of a government contract are generally assumed to be merely incidental beneficiaries, and may not enforce the contract," a third party must show that the parties "clear[ly] inten[ded]" that the third party be permitted to sue to enforce the contract. Beckett v. Air Line Pilots Ass'n, 995 F.2d 280, 288 (D.C. Cir.1993) (emphasis in original).

Edwards v. Aurora Loan Servs., LLC, 791 F. Supp. 2d 144, 151 (D.D.C. 2011) (punctuation modified).[4]

If it were otherwise, members of the public would be able freely to hale private parties that contracted with government entities into court and sue the government entities, as well—creating the potential for no small measure of havoc in public contracting. While negotiations over a contract might have produced a working understanding by the parties as to how their agreement would operate, that understanding might well be in jeopardy, because thousands of strangers to that contract could seek to upset the parties' understanding of what their agreement meant and how it was to operate.

Further, under Plaintiffs' view, decisions by a contracting party to invoke or waive rights under the contract could be overridden by members of the public. This would mean that contracting parties would never know exactly what rights a party might or must insist on, or what rights could be traded off for other concessions by the opposing party, given that any member of the public might disagree and sue for breach. Contractual gridlock could easily erupt if thousands

---

[4] An illustration of this principle can be found in in Caldas v. Affordable Granite & Stone, Inc., where employees of a contractor who performed work pursuant to a municipal contract with a city brought action against the contractor, seeking to recover for the contractor's alleged breach of prevailing wage provision in the contract, the Minnesota Supreme Court held that the prevailing wage provision mentioning employee wages in the agreement did not manifest a specific intent to confer third party status on plaintiffs. 820 N.W.2d 826, 835 (Minn. 2012).

of motorists could tie up a contracting party with myriad—and potentially conflicting—views of what breaches, real or fanciful, have taken place.

The potential for chaos in public contracting could be far-reaching—not just for completed agreements but for those not yet concluded. Private entities would have to assess how confident they could ever be of understandings reached with government entities if members of the public could freely insert themselves into contract enforcement by way of third-party beneficiary status. This significant measure of uncertainty could profoundly impede government contracting in every context.

This was recognized over a century ago by the United States Supreme Court, when it rejected the claimed third-party beneficiary right of a fire loss assignee to sue the company that had contracted to supply waterworks to a municipality for failing to properly locate a hydrant, by reason of which the fire could not be extinguished:

> To hold to the contrary would unduly extend contract liability, would introduce new parties with new rights, and would subject those contracting with municipalities to suits by a multitude of persons for damages which were not, and, in the nature of things, could not have been, in contemplation of the parties.

German All. Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 231(1912).

The instant case shows how Plaintiffs' expansive view of third-party beneficiary status could well lead to significant interference with public contracting, both for the City and the entity that contracted with it. Plaintiffs allege that UBP has breached the agreement by its "failure to adhere to the contract's purpose and obligations" including "[m]isrepresenting the nature and cost of tolling…[f]ailing to provide adequate notice to travelers about tolling costs and policies…[i]mposing new toll structures that are excessive, burdensome and damaging to Bay County's economy…and [e]ngaging in conduct that demonstrates complete disregard for the interests of the public…." Compl. ¶¶119–120. And the City allegedly breached the agreement by

"improperly acquiesce[ing]" in UBP's "practices that are contrary to the stated objectives of the contract" and by failing to require UBP "to adhere to the terms and conditions of the purpose and obligations" of the agreement. Id.

These allegations envision a broad critique of how the agreement is to be understood and how it must operate, whether or not that accords with the understanding of the parties that actually negotiated it. In the context of a public contract, granting Plaintiffs standing as third-party beneficiaries would mean that the City could be hamstrung in promoting its view of the public good—a view that is apparently very different from Plaintiffs' view. Allowing Plaintiffs to enforce the agreement would mean that the City would lose control of promoting the public good, as it understands that value—a notion that contradicts the fundamental value of having governments instituted to resolving competing views of what does serve the public good.

Given the significant disruption to the contracting process, it is inconceivable that the parties intended that bridge users would be more than incidental beneficiaries. The solitary mention of Bay City motorists and bridge users confirms that.

Notably, the central promise that Plaintiffs seek to enforce does not evince any intent to benefit bridge users. The prohibition of charging tolls until substantial completion of the restoration project was plainly designed to give an incentive to UBP to finish the project expeditiously. It is akin to a bonus payment as a "carrot" for early completion and a price penalty as a "stick" for torpid work. Nothing suggests that the purpose of the incentive was to enrich bridge users with free crossings. The City sought to have the bridge restoration completed as quickly as possible, and the provisions allowing for tolling only after substantial completion served as incentive to achieve this end. The motorists and bridge users were entirely incidental to the agreement to complete the bridge.

9

Therefore, Plaintiffs lack standing to bring a third-party claim to enforce the agreement.

### 3. Breach of a Separate Contract

In Count III, Plaintiffs assert a separate breach of contract claim against UBP, claiming that "an express contract was formed between [UBP] and its customers," Compl. ¶ 124, because the "Save Time, Save Money" slogan UBP used to promote its monthly unlimited toll pass induced Plaintiffs "to purchase the pass under the reasonable expectation that they would receive unlimited crossings at a fixed cost," id. ¶ 124.  Plaintiffs argue that UBP breached this express agreement "as it failed to deliver the promised benefits of the unlimited pass as well as improperly imposing tolls in direct violation of the Concession and Lease Agreement prior to completion of the Independence Bridge."  Compl. ¶ 162.

"An express contract is one where the intention of the parties and the terms of the agreement are declared or expressed by the parties, in writing or orally, at the time it is entered into." McInerney v. Detroit Tr. Co., 271 N.W. 545, 547 (Mich. 1937) (punctuation modified).  "A valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation."  AFT Mich. v. State, 866 N.W.2d 782, 804 (Mich. 2015).

UBP argues that Plaintiffs have not successfully pled an express contract.  UBP takes issue with Plaintiffs' reliance on UBP's marketing slogan, stating that a marketing slogan is not a contractual offer.  Courts consistently hold that general advertisements, proposals, or promotional language presented to the public are not offers that can be unilaterally accepted and made binding, but instead are mere invitations to negotiate.  See 1 E. Farnsworth, Contracts, § 310, p. 260–261, and n.30 (3d ed. 2004); Restatement (Second) of Contracts § 26 (explaining that advertising and solicitations are "not ordinarily intended or understood as offers").  UBP asserts that here there is

no specificity, no essential terms, and no clear intent to be bound—only the sort of "puffery" that is common to commercial advertising.  UBP Mot. at PageID.372.

But whether characterized as a slogan, the communication alleged to have been made by Plaintiffs was that unlimited passage was promised to those who paid for unlimited passes.  "The offer was the unlimited-use subscription for a fixed monthly price; the acceptance was Plaintiffs' purchase; the consideration was the fee paid; the breach was restricting access.  The damages flow directly from the breach: Plaintiffs paid for access they did not receive."  Resp. at PageID.658.

What was communicated to pass purchasers may well be in dispute.  But at the pleading stage, Plaintiffs have plausibly pled the existence of a contract that has been breached and caused damage.[5]

### 4. Implied Contract

In Count IV, which is pled in the alternative to Count III, Plaintiffs allege that UBP breached an implied contract.  That is, in exchange for paying tolls and/or purchasing an unlimited crossing pass(es), UBP would provide continuous, reliable access to the bridge 24-hours per day, 7 days a week.  UBP argues that Plaintiffs do not and cannot adequately plead any of the requisite elements for an implied contract, and, alternatively, even if an implied contract existed, it would be barred by the statute of frauds.

"A contract is implied in fact where the intention as to it is not manifested by direct or explicit words between the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances

---

[5] UBP also references a Terms and Service agreement between UBP and Plaintiffs, which UBP accuses Plaintiffs of ignoring and suggests that it precludes them from attacking the agreement between UBP and Bay City.  The Court is unable to consider this document because it not an exhibit or part of the record.  Gavitt v. Born, 835 F.3d 623, 640 (6th Cir. 2016).

attending the transaction." Erickson v. Goodell, 180 N.W.2d 798, 800 (Mich. 1970); see also Decker v. City of Wyandotte, No. 236372, 2002 WL 31956958, at *6 (Mich. Ct. App. Dec. 20, 2002) (citation omitted) (holding that courts determine whether parties mutually assented to an alleged implied contract by objectively examining "the express words of the parties and their visible acts" to determine whether "[a] meeting of the minds [has] occur[ed] on all the material facts").

UBP argues that the alleged terms of the alleged implied contract (24/7 bridge access) were terms from UBP's contract with the City and that Plaintiffs have alleged no facts establishing an agreement between UBP and Plaintiffs. UBP Mot. at 15. Plaintiffs respond that they paid for access to a functioning, continuously open bridge—which was the essence of the bargain—both as UBP marketed it and as the public reasonably understood it. Pls. Resp at 20. What Plaintiffs could reasonably have expected will depend on the full development of the record. But at this pleading stage, the claim of an implied contract is at least plausible.

Alternatively, UBP argues that even if an implied contract exists, it is barred by the statute of frauds. Under Michigan law, contracts that cannot be completed within one year of formation must be "in writing and signed with an authorized signature by the party" to the contract. See Mich. Comp. Laws § 566.132(1); see also Ralph Roberts Realty, LLC v. Tyson, No. 345230, 2019 WL 6248354, at *3 (Mich. Ct. App. Nov. 21, 2019). Michigan's statute of frauds applies equally to implied contracts. See, e.g., Ware v. Bronson Methodist Hosp., No. 307886, 2014 WL 5689877, at *7 (Mich. Ct. App. Nov. 4, 2014) (holding breach of implied contract claim was barred by statute of frauds).

UBP's statute of frauds argument is undeveloped. It seems that UBP is asserting that Plaintiffs' claim is barred because performance could not be completed within a year—but this

does not apply to the facts at hand.  As Plaintiffs point out, the proper inquiry is whether the contract is capable of performance within one year, not whether it is likely to be performed within that time.  Resp. to UBP Mot. at 2, citing Dumas v. Auto Club Ins. Ass'n, 473 N.W.2d 652, 657 (Mich. 1991).  Here, a monthly toll subscriber could cancel his subscription after one month, rendering the performance complete.

Therefore, the statute of frauds does not appear to bar the claim.

### 5. **Unjust Enrichment**

In Count V, Plaintiffs allege that UBP has been unjustly enriched because Plaintiffs made payments (including for monthly passes) expecting 24/7 bridge access, but during the period in controversy the bridge was typically only open daily from 7 a.m. to 7 p.m.  Compl. at ¶¶ 144–147.

A contract implied-in-law—commonly referred to as unjust enrichment or quasi-contract—is an equitable remedy that may be imposed where a defendant has obtained and retained a benefit under circumstances where equity requires restitution.  Morris Pumps v. Centerline Piping, Inc., 729 N.W.2d 898, 903 (Mich. App. 2006).  To sustain a claim for unjust enrichment, a plaintiff must establish two elements: (i) the defendant's receipt of a benefit from the plaintiff, and (ii) an inequity resulting to the plaintiff because of the retention of that benefit.  Dumas, 473 N.W.2d at 663.  "Generally, an implied contract may not be found if there is an express contract between the same parties on the same subject matter."  Morris Pumps, 729 N.W.2d at 903 (emphasis in original).

UBP argues that Plaintiffs cannot bring an unjust enrichment claim where there is an express contract covering the same subject matter between those parties.  UBP Mot. at 17. Michigan law, however, permits plaintiffs to plead inconsistent claims, including claims for breach of contract and unjust enrichment in the alternative, "when there is some question of whether an

express contract actually existed." Endoscopy Corp. of Am. v. Kenaan, No. 359398, 2023 WL 2439487 at *9 (Mich. App. Mar. 9, 2023). Because the existence of an express contract has been challenged, it would be premature to dismiss the claim for unjust enrichment.

UBP also argues that Plaintiffs' unjust enrichment claim fails because "equitable relief in the form of an unjust enrichment claim is not available where an adequate legal remedy exists." UBP Mot. at 8 (citing Glob. Crossing Telecomms., Inc. v. Michigan Bell Tel. Co., No. 09-14686, 2010 WL 2011502, at *4 (E.D. Mich. May 17, 2010). But in Glob. Crossing Telecomms, there was an undisputed longstanding contract between the parties, unlike here where the existence of an express contract is a disputed issue. At the pleading stage, it is uncertain whether an adequate remedy exists.

Finally, UBP argues that Plaintiffs' unjust enrichment claim must fail because they did not suffer any damages—they paid for passage over the bridge and received passage. Mot. at 18. This is not a serious argument. Here, Plaintiffs allege they paid for 24/7 bridge access and did not receive it. This is enough, at the pleading stage, for an unjust enrichment claim.

The Court finds that Plaintiffs' unjust enrichment claim regarding collecting fees for monthly passes from Plaintiffs without providing them 24/7 access survives the motion to dismiss.

### 6. Michigan Consumer Protection Act

In Count VI, Plaintiffs claim that UBP violated the Michigan Consumer Protection Act (MCPA). Plaintiffs agree that dismissal of this claim is currently required, but they note that that could change as there is currently a case pending before the Michigan Supreme Court that would alter this result.

### 7. Injunctive Relief

14

Count VII is a request for unspecified injunctive relief.  Compl. ¶¶ 161–165.  UBP says that this is not a standalone cause of action.  UBP Mot. at 20–22.  Plaintiffs agree that this count should be dismissed.  Resp. to UBP at 24–25.

### B.  Bay City's Motion to Dismiss

In its motion to dismiss, Bay City argues that the claims against it, Counts I and II, should be dismissed.  For the same reasons as stated above, the Court grants the motion to dismiss with respect to both counts.

### III. CONCLUSION

The Court grants UBP's motion to dismiss (Dkt. 20) only with respect to Counts I, II, VI, and VII; it is denied as to all other counts.  The Court grants Bay City's motion to dismiss (Dkt. 21) in full.

**SO ORDERED.**

Dated: March 31, 2026                                    s/Mark A. Goldsmith
Detroit, Michigan                                        MARK A. GOLDSMITH
                                                         United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 31, 2026.

                                                         s/Joseph Heacox
                                                         JOSEPH HEACOX
                                                         Case Manager